## CLAIBORNE COUNTY *v.* BROOKS.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TENNESSEE.

Argued April 2d, 1884.—Decided April 21st, 1884.

*Municipal Corporations.*

When the settled decisions of the highest court of a State have determined the extent and character of the powers which its political and municipal organizations shall possess, the decisions are authoritative upon the courts of the United States.

In the absence of State statutes, or of settled decisions of the highest court of a State, the rule of interpretation in respect of the powers of political and municipal corporations is to be found in the analogies furnished by their prototypes in the country of common origin, varied and modified by circumstances peculiar to our political and social condition.

The power to issue commercial paper is foreign to the objects in the creation of political divisions into counties and townships, and is not to be conceded to such organizations unless by virtue of express legislation, or by very strong implication from such legislation.

The power which the statutes of Tennessee confer upon a county in that State, to erect a court-house, jail, and other necessary county buildings, does not authorize the issue of commercial paper as evidence or security for a debt contracted for the construction of such a building. *Ross* v. *Anderson County*, 8 Baxter, 249, shown to be consistent with this decision.

This was an action of debt, brought by the appellee, the plaintiff below, as bankrupt assignee of Howard, Cole & Co., against the county of Claiborne, Tennessee, on its bond or obligation, dated 7th day of April, 1868, payable to one V. H. Sturm or order for $5,000, with interest, and indorsed by Sturm to Howard, Cole & Co.

The following is a copy of the bond, together with the indorsement thereon, to wit:

"County Court. April Term, 1868.
"THE STATE OF TENNESSEE, *County of Claiborne:*

"On or before the first day of January, 1870, the County of Claiborne is hereby bound and promises to pay to V. H. Sturm, or order, the sum of five thousand dollars, bearing interest from this date at the rate of six per centum per annum until paid. And this bond is redeemable by the county at any earlier date if they choose to do so.

"By order of the County Court of said county, at its quarterly term, on the first Monday of April, 1868, a majority of the acting justices of the peace for said county having voted the same, and ordered the bond of the county to be issued therefor.

"Witness Thomas L. Davis, chairman of the County Court of said county, and the seal of the court, this 7th day of April, 1868.

"[SEAL] THOS. L. DAVIS, *Chairman.*
"Attest: DAVID CARDWELL, *Cl'k.*"

Indorsed: "Pay to Howard, Cole & Co., waiving demand, notice and protest. Victor H. Sturm."

The case was commenced in the State court and was removed into the Circuit Court of the United States, and came up for trial on the pleas of *non est factum, nil debet,* and payment, other pleas having been overruled on demurrer.

A verdict being rendered in favor of the plaintiff under the charge of the court, exceptions were taken to the charge.

The bill of exceptions stated that on the trial the plaintiff introduced proof tending to show that the county of Claiborne, by its County Court, appointed commissioners, who contracted with Sturm for the erection of a court-house in Tazewell, the county seat; that by the original contract he was to receive $8,000; and that the contract was subsequently modified so as to enlarge the building, without fixing specifically the additional price to be paid. The plaintiff further exhibited proof of the following orders made by the County Court and entered of record, namely, on the 6th of April, 1868, the following:

" *Ordered*, by the court that V. H. Sturm be allowed the sum of ten thousand dollars, in part pay for the court-house."

And on the 4th day of January, 1869, the following:

" It was this day ordered by the court that Benjamin Ausmus, revenue collector of Claiborne County, be permitted to examine and investigate the payment or transfer of certain county bonds issued in favor of V. H. Sturm, and whether or not said bonds have been paid, transferred, or assigned to any party for a full and valid consideration before the 7th July, 1868; and if so, that the said Ausmus, as revenue collector, be allowed to pay over or deposit what funds he may have on hand, collected for that purpose, to the person or persons holding legal and lawful possession of said bonds. But should the bonds have been enjoined before or since the above date, then the money so collected and in the hands of said revenue collector will be deposited with the clerk of the Chancery Court at Knoxville, taking his receipt therefor."

There was also evidence tending to show that the bond sued on was made and delivered to Sturm by the chairman of the County Court, together with another similar bond, which has been paid.

The defendant introduced evidence tending to show: That the value of the additional work on the court-house was $3,000; that between $10,000 and $11,000 had been paid to the con-

tractor, V. H. Sturm, and his order, outside of the amount called for in the bond sued on.

The following sections of the Code of Tennessee show the powers of counties in that State in relation to the erection of public buildings and the making of contracts :

§ 402. " Every county is a corporation, and the justices in the County Court assembled are the representatives of the county and authorized to act for it."

§ 403. " Suits may be maintained against a county for any just claim as against other corporations."

§ 404. " Each county may acquire and hold property for county purposes, and make all contracts necessary or expedient for the management, control and improvement thereof, and for the better exercise of its civil and political power ; may do such other acts and exercise such other powers as may be allowed by law."

§ 408. " It is the duty of the County Court to erect a court-house, jail, and other necessary county buildings."

§ 410. Such buildings " shall be erected within the limits of the county town."

§ 411. " The county buildings are to be erected and kept in order and repair at the expense of the county, under the direction of the County Court, and it may levy a special tax for that purpose."

§ 414. [Confers power on the justices of the County Court, when deemed for the public interest, to change the site of the county jail or court-house, and to order a sale of the site or materials] ; " and they may also order that a more eligible, convenient, healthy, or secure site be purchased, and cause to be erected thereon a new jail or court-house, better suited to the convenience of said town, and secure the safe custody, health, and comfort of the prisoners."

§ 415. " The said justices shall appoint not less than three nor more than five commissioners, a majority of whom shall be competent—

" To make such sale and purchase ;

" To contract for and superintend the erection of the new jail and court-house ; and

" To carry into execution all such orders as said justices may deem necessary and proper in the premises."

The defendant's attorney requested the court to instruct the jury—

"*First.* That in the absence of express power conferred by statute, the county of Claiborne, as a corporation, had no power to make and issue a negotiable interest-bearing bond such as the one sued on, there being no implied power to issue such a bond.

"*Second.* There being no authority for the issuance of such bonds, the chairman of the County Court had no right to make or issue it, and the payment of a similar bond by the county would not operate as a ratification or this bond or make it valid."

Amongst other things not excepted to, the judge instructed the jury as follows, to wit :

"*First.* That the defendant, Clairborne County, a corporation under the laws of Tennessee, through the County Court, was authorized to erect a court-house ; that the power to erect implied the right to contract for the same, and if the court had the right to make a contract for the erection of the court-house, he instructed them that the court had the incidental or implied power to execute a note, bond, or other negotiable security in payment of such contract, and might legally issue such an instrument as the bond sued on."

"That a corporation with power to make a contract like an individual, might make and issue commercial paper as evidence of or security for the contract."

"The court further instructed the jury that they would look to the evidence and ascertain whether the County Court ordered the chairman to make the bond sued on ; if it did not so order, the chairman had no power or authority to make it ; but if, after its execution, the county court made an order on the tax collector to hunt up the holders of this and another bond like this, and pay it, that this would be a ratification of the action of the chairman, and would validate the bond sued on.

"If the jury should so find, they would then find in favor of the plaintiff the amount of the bond and interest thereon at six per cent. per annum from its date."

To these portions of the charge the defendant excepted, and assigns the same for error.

The jury returned a verdict of $8,741 for the plaintiff, being for principal and interest of the bond.

Judgment was entered for plaintiff accordingly, and the defendant sued out this writ of error.

*Mr. Jesse L. Rogers* for plaintiff in error.

*Mr. James G. Rose* for defendant in error.—There was no error in the charge that the authority that could make the bond in the first instance, the County Court, could ratify an unauthorized making of it. *Supervisors* v. *Schend,* 5 Wall. 772; *County of Ray* v. *Vansycle,* 96 U. S. 675, 687. The right to construct the buildings included the right to create debts for doing so. *Lynde* v. *The County,* 16 Wall. 6; *Wood* v. *Tipton County,* 7 Baxter, 112; *Carey* v. *Campbell County,* 5 Sneed, 515; *Davidson County* v. *Alwell,* 4 Lea, 28; *Camp* v. *Knox County,* 3 Lea. 199; *Mills* v. *Gleason,* 11 Wis. 470; *Bank* v. *Chillicothe,* 7 Ohio, part 2, 31. That a trading corporation may issue commercial paper is not doubted. The power of a municipal corporation to do the same has been sustained in the following cases. *Meyer* v. *Muscatine,* 1 Wall. 384; *Rogers* v. *Burlington,* 3 Wall. 654; *Lynde* v. *The County,* 16 Wall. 6; *Ross* v. *Anderson County,* 8 Baxter, 249; *De Voss* v. *Richmond,* 11 Gratt. 338; *Evansville, Indiana, &c., Railroad* v. *Evansville,* 15 Ind. 395; *Hamilton* v. *Pittsburg,* 34 Penn. St. 496; *Middleton* v. *Alleghany County,* 37 Penn. St. 237, 241; *Reinbath* v. *Pittsburg,* 41 Penn. St. 278.

MR. JUSTICE BRADLEY delivered the opinion of the court. He stated the facts as above, and continued:

From the instructions requested by the defendant and those given by the court (although there is a want of explicitness in the bill of exceptions), we gather that the real controversy was, whether the defendant could set up against the assignees of the bond a defence (such as payment) which would have been good against Sturm, the original holder, as to whom evidence was given tending to show that he had received from the county all, or nearly all, that he was entitled to, independently of the bond sued on. Unless this was the real controversy we

do not see the relevancy of the charge.  For, if the right of
the defendant to set up the defence which it had against the
bond in the hands of Sturm was not denied or disputed, we do
not see of what importance the particular form of the instru-
ment would have been.   But if the form was relied on as pre-
cluding any such defence, then the charge was clearly material,
and had a decisive bearing upon the case.

The doctrine of the charge is that the power of a county to
erect a court-house involves and implies the power to contract
for its erection, and the power to contract involves and implies
the power to execute notes, bonds, and other commercial paper
as' evidence or security for the contract ; or, to state it accord-
ing to its legitimate conclusion and result, it is this, that when-
ever a county has power to contract for the performance of any
work or for any other thing, it has incidental power to issue
commercial paper in payment thereof ; that the one power im-
plies the other.   It being clear that the county of Claiborne
had power to erect a court-house, the court below held that
this involved an implied power to contract out the work, and
to issue negotiable bonds of a commercial character in payment
thereof.

We cannot concur in this view.   The erection of court-houses,
jails and bridges is amongst the ordinary political or adminis-
trative duties of all counties ; and from the doctrine of the
charge it would necessarily follow that all counties have the
incidental power, without any express legislative authority, to
issue bonds, notes, and other commercial paper in payment of
county debts and charges ; and if they have this power, then
such obligations issued by the county authorities and passing
into the hands of *bona fide* holders, would preclude the county
from showing that they were issued improperly, or without con-
sideration, or for a debt already paid ; and it would then be in
the power of such authorities to utter any amount of such
paper, and to fasten irretrievable burdens upon the county
without any benefit received.   Our opinion is, that mere politi-
cal bodies, constituted as counties are, for the purpose of local
police and administration, and having the power of levying
taxes to defray all public charges created, whether they are or

are not formally invested with corporate capacity, have no power or authority to make and utter commercial paper of any kind, unless such power is expressly conferred upon them by law, or clearly implied from some other power expressly given, which cannot be fairly exercised without it. Our views on this subject were distinctly expressed in the case of *Police Jury* v. *Britton*, 15 Wall. 566, where, speaking of the power of local political bodies to issue commercial paper, we said: "It seems to us to be a power quite distinct from that of incurring indebtedness for improvements actually authorized and undertaken, the justness and validity of which may always be inquired into. It is a power which ought not to be implied from the mere authority to make such improvements. It is one thing for county or parish trustees to have the power to incur obligations for work actually done in behalf of the county or parish, and to give proper vouchers therefor, and a totally different thing to have the power of issuing unimpeachable paper obligations which may be multiplied to an indefinite extent. If it be once conceded that the trustees, or other local representatives of townships, counties, and parishes, have the implied power to issue coupon bonds, payable at a future day, which may be valid and binding obligations in the hands of innocent purchasers, there will be no end to the frauds that will be perpetrated. We do not mean to be understood that it requires in all cases express authority for such bodies to issue negotiable paper. The power has frequently been implied from other express powers granted. Thus, it has been held that the power to borrow money implies the power to issue the ordinary securities for its repayment, whether in the form of notes or bonds payable in future." pp. 571–2.

In that case the suit was brought on coupons of bonds given to take up certain levee warrants issued by the police jury of the parish; and the court were unanimously of opinion that the police jury had no power to issue such bonds.

In the subsequent case of *The Mayor of Nashville* v. *Ray*, 19 Wall. 468, the circumstances were somewhat different. That was the case of an incorporated city, and the suit was brought on treasury warrants drawn by the mayor and recorder on the

city treasurer, payable to bearer, and originally delivered to various persons for work done for the city; they were afterwards received by the tax collector in payment of taxes, and then sold for such price as they would bring to raise money for city purposes; the plaintiff had purchased the warrants in suit, and evidence was given to show that he had notice that they had been paid in and received for taxes; but the court below held that the corporation had the right to issue promissory notes and other securities; and that, if it was the usage to reissue them in this way, they would, when sold and reissued, be obligatory on the city. All the justices of this court held that when originally issued, they were valid as vouchers and evidences of actual indebtedness, and the three dissenting justices held with the court below that they were valid obligations when reissued; but a majority of the court concurred in reversing the judgment, and four of the justices were of opinion that, as the city had no express power to borrow money or to issue commercial paper, and, in their view, no general power by which it was necessarily implied, the warrants when once paid in for taxes were nothing but redeemed vouchers, and *functus officio*, and ceased to have any validity, and that the city officers had no authority to reissue them; that it was an unauthorized use of the city's credit, and an attempt to borrow money and to issue commercial paper without any power or authority to do so; and that the plaintiff's claim of being a *bona fide* holder could not avail him. In discussing the subject the following remarks were made, which were quoted with approval in the subsequent case of *Wall* v. *County of Monroe*, 103 U. S. 78: "Vouchers for money due, certificates of indebtedness for services rendered, or for property furnished for the use of the city, orders or drafts drawn by one city officer upon another, or any other device of the kind, used for liquidating the amounts legitimately due to public creditors, are, of course, necessary instruments for carrying on the machinery of municipal administration, and for anticipating the collection of taxes. But to invest such documents with the character and incidents of commercial paper, so as to render them in the hands of *bona fide* holders absolute obligations to pay, however

irregular or fraudulently issued, is an abuse of their true character and purpose." And again : " Every holder of a city order or certificate knows that, to be valid and genuine at all, it must have been issued as a voucher for city indebtedness. It could not be lawfully issued for any other purpose. He must take it, therefore, subject to the risk that it has been lawfully and properly issued. His claim to be a *bona fide* holder will always be subject to this qualification. The face of the paper itself is notice to him that its validity depends upon the regularity of its issue. The officers of the city have no authority to issue it for any illegal or improper purpose, and their acts cannot create an estoppel against the city itself, its tax-payers or people. Persons receiving it from them know whether it is issued, and whether they receive it for a proper purpose and a proper consideration. Of course they are affected by the absence of these essential ingredients; and all subsequent holders take *cum onere*, and are affected by the same defect."

The counsel for the defendant in error relies strongly on the cases of *Lynde* v. *County of Winnebago*, 16 Wall. 6, decided by this court, and the *State ex rel. Ross* v. *Anderson County*, 8 Baxter, 249, decided by the Supreme Court of Tennessee, as well as upon various decisions of other State courts, particularly *Williamsport* v. *Commonwealth*, 84 Penn. St. 487; *Mills* v. *Gleason*, 11 Wisconsin, 470, and *Bank of Chillicothe* v. *Chillicothe*, 7 Ohio, pt. 2, p. 31.

Conceding that views different from those which we have expressed are entertained by some of the State courts, and that they may be controlling in the States where they are thus entertained, we are more especially concerned to know what is held to be the law in Tennessee, as well as what may have been held in the decisions of this court in former cases.

In the case of *Lynde* v. *County of Winnebago*, the county had express legislative authority to *borrow money* for the erection of public buildings, to be determined by the people of the county at any regular election, or special election called for the purpose. The question in the case was, not as to the existence of the power, but as to the effect of the evidence on the question whether the conditions for its exercise had been complied

with.  The court held that the evidence was sufficient, and
sustained the bonds.  It was not pretended that the county
would have had power to issue them if such power had not
been conferred by the legislature, either expressly or by neces-
sary implication,. from "he express power to "borrow money."

In the case of *The ' ate ex rel. Ross* v. *Anderson County,* the
authority to issue bc ids  as still more explicit.  An act of the
legislature of Tennessee, passed in 1852, ch. 191, had author-
ized certain counties to subscribe stock in any chartered rail-
road located through said counties, in any amount determined
upon, in the manner prescribed by law, and *to issue bonds* for
the amount subscribed.  Another act, passed in 1854, applied
these provisions expressly to Anderson County, and the bonds
in question in that case were issued in pursuance of this act,
although the preliminary proceedings had been taken under a
different act which authorized a subscription to the stock, but
did not expressly authorize the issue of bonds therefor.  The
Supreme Court of Tennessee, it is true, expressed an opinion
that authority to issue the bonds was implied from the power
given to subscribe for stock without the aid of the act of 1854,
stating, as a general rule, " that a county, like another corpora-
tion, having right to create a debt, has also the incidental
right to issue the commercial evidence of it, in such forms as
may be satisfactory to the parties."  But the statement of this
general proposition may be regarded as only a *dictum* in the
case, since the judgment was fully supported by the express
provisions of the act of 1852, ch. 191, if not by the power given
to subscribe for stock in a railroad corporation.  We are not
referred to any other decision of the Supreme Court of
Tennessee which comes any nearer to a determination of the
question.

It is undoubtedly a question of local policy with each State,
what shall be the extent and character of the powers which its
various political and municipal organizations shall possess ; and
the settled decisions of its highest courts on this subject will be
regarded as authoritative by the courts of the United States ;
for it is a question that relates to the internal constitution of
the body politic of the State.  But as all, or nearly all the

States of the Union, are subdivided into political districts similar to those of the country from which our laws and institutions are in great part derived, having the same general purposes and powers of local government and administration, we feel authorized, in the absence of local State statutes or decisions to the contrary, to interpret their general powers in accordance with the analogy furnished by their common prototypes, varied and modified, of course, by the changed conditions and circumstances which arise from our peculiar form of government, our social state and physical surroundings.

With regard to the political divisions of counties and townships, we have heretofore, in the cases referred to, expressed our views as to their power of issuing paper obligations of a commercial character. We consider such a power as entirely foreign to the purposes of their creation, and as never to be conceded except by express legislation, or by necessary, or, at least, very strong implication from such legislation. The reasons for these views were fully expressed in those cases, and need not be repeated. We adhere to them without modification.

But when a case comes before us from a State in which a different policy prevails, clearly shown by the local constitution or statutes, or by the settled decisions of the State courts, we are bound to decide it accordingly. We are not satisfied that this is such a case.

The sections of the Code of Tennessee already referred to, so far as we can perceive, confer only the ordinary powers generally given to county jurisdictions. No extraordinary powers are given; and no mode of raising funds for the erection or repair of public buildings is pointed out, except the levy of a special tax. In the case of *Wells* v. *Supervisors*, 102 U. S. 625, 631, we held that the power to issue county bonds did not arise from a power to subscribe for stock in a railroad company, where authority was at the same time given to assess and collect a tax for the payment of the capital stock, and no other authority to raise the requisite funds was given.

Under the Code of Tennessee contracts may of course be made for the erection or repair of public buildings, and the power to issue vouchers for payment is necessarily implied; but

no power is given to issue bonds or other commercial paper having the privileges and exemptions accorded to that class of commercial securities. No such power is expressly given, and in our judgment no such power is necessarily implied. The document sued on in this case may very well have served the purpose of a voucher to show a stated account as between Sturm and the county, and may be of such form as to be assignable by indorsement, but it must always be liable, in whosesoever hands it may come, to be open for examination as to its validity, honesty, and correctness.

*The judgment of the Circuit Court must be reversed, and the cause remanded with directions to award a new trial, and to take such further proceedings as may be in accordance with this opinion.*